**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
In re                                                                    Chapter 7
SOUP KITCHEN INTERNATIONAL INC.,                      Case No. 1-10-44670 (CEC)
                                        Debtor.
-------------------------------------------------------------------x
ROBERT L, GELTZER, as Chapter 7 Trustee                  Adv. Pro. No. 1-11-01317 (CEC)
of Soup Kitchen International, Inc.,
                                        Plaintiff,
                        v.
THE ORIGINAL SOUPMAN INC.,
SEBASTIAN RAMETTA, ROBERT BERTRAND,
PENNY FERN HART, DANIEL RUBANO,
HANK GRACIN, RONALD L. CRANE,
LEHMAN & EILEN, LLP and JOHN DOE #1-4,
                                        Defendants.
-------------------------------------------------------------------x
PENNY FERN HART,                                            Adv. Pro. No. 1-10-01330 (CEC)
                                        Plaintiff,
                        v.
JOHN BELLO, MAJ-BRITT ROSENBAUM
and WILLIAM McCREERY,
                                        Defendants.
-------------------------------------------------------------------x
JOHN BELLO, MAJ-BRITT ROSENBAUM
and WILLIAM McCREERY,
                                        Third-Party Plaintiffs,
                        v.
THE ORIGINALSOUPMAN INC., SEBASTIAN
RAMETTA, ROBERT BERTRAND, HANK
GRACIN, RONALD L. CRANE, SOUP ONE INC.,
INTERNATIONAL GOURMET SOUPS, INC.,
SOUP ROCK CENTER INC. and DANIEL RUBANO,
                                        Third-Party Defendants.
-------------------------------------------------------------------x

APPEARANCES:

Robert L. Geltzer, Esq.          Michael L. Schein, Esq.          Edward J.M. Little, Esq.
Law Offices of Robert L. Geltzer  Vedder Price                    Christopher Gartman, Esq.
1556 Third Avenue,               1633 Broadway, 47th Floor,       Hughes Hubbard & Reed LLP
New York, NY  10128              New York, NY  10019              One Battery Park Plaza,
*Chapter 7 Trustee*              *Attorneys for Penny Fern Hart*  New York, NY  10004
                                                                  *Attorneys for The Original*
M. Alexander Bowie, II, Esq. &   Anastasios Ernest Tonorezos, Esq. *Soupman, Inc.*
Michael Weiss, Esq.              Wilson Elser
  Day Pitney LLP                 150 East 42nd Street,            Robert A. Wolf, Esq.
  7 Times Square,                New York, NY  10017              Squire Sanders LLP
  New York, NY  10036            *Attorneys for Lehman & Eilen and* 30 Rockefeller Plaza,
Joshua W. Cohen, Esq.            *Hank Gracin*                    New York, NY  10112
  Day Pitney LLP                                                  *Special Litigation Counsel for the*
  One Audubon Street,                                             *Chapter 7 Trustee*
  New Haven, CT  06511
*Attorneys for John Bello, Maj-Britt*
*Rosenbaum and William McCreery*

## DECISION

CARLA CRAIG
Chief United States Bankruptcy Judge

This matter comes before the Court on the motion of twelve settling parties to approve a global settlement of disputes related to the main bankruptcy case and adversary proceedings captioned above.  ECF No. 47 ("Motion").[1]  The Motion was filed by Robert L. Geltzer, as chapter 7 trustee (the "Trustee"), Penny Fern Hart ("Hart"), The Original Soupman Inc. ("TOSI"), Sebastian Rametta ("Rametta"), Robert Bertrand ("Bertrand"), Daniel Rubano ("Rubano") and Ronald L. Crane ("Crane" and, collectively, TOSI, Rametta, Bertrand, Rubano, and Crane are the "TOSI Defendants"), Soup One, Inc., International Gourmet Soups, Inc. and Soup Rock Center, Inc. (collectively, Soup One, Inc., International Gourmet Soups, Inc., and Soup Rock Center, Inc. are the "TOSI Affiliates"), Hank Gracin ("Gracin"), and Lehman & Eilen, LLP ("L&E").  Attached as Exhibit A to the Motion, the stipulation of settlement (the "Settlement") would settle several claims, counterclaims, and third party claims in two adversary proceedings, dismiss other claims in those proceedings, and withdraw or subordinate creditor claims or future creditor claims against Soup Kitchen International Inc. ("SKI" or the "Debtor") in the main bankruptcy case.

John Bello, Maj-Britt Rosenbaum and William McCreery (collectively, the "Bello Group"), who are shareholders, former insiders, and contingent creditors of the estate, filed an objection to the Motion.  ECF No. 52 ("Objection").  A group of SKI's shareholders filed a joinder to the Objection.  ECF No. 54 ("Joinder").  In addition to filing a written Objection, counsel to the Bello Group cross examined the Trustee at a hearing held on August 29, 2013. The Bello Group contends that the Trustee has not produced adequate information about the

---

[1] "ECF No." refers to the record of Adv. Pro. No. 11-01317 (the "Trustee Action"), unless the citation indicates a different case number.

probability of the litigation's success, or the value of its potential recovery, to enable the Court to approve the Settlement under Rule 9019.  The Bello Group members also object because the Settlement does not include a release of their personal guaranties of a loan to SKI, which remains unpaid.

The Bello Group's objections ignore or minimize the substantial obstacles to recovery by the Trustee, and reflect the fact that, as shareholders and guarantors of SKI's debt, they have little to lose by continuation of this litigation.  Accordingly, and for the reasons explained in this decision, the Bello Group's objections are overruled, the Motion is granted and the Settlement is approved.

**JURISDICTION**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, and the Eastern District of New York standing order of reference dated August 28, 1986, as amended by order dated December 5, 2012.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (H) and (O).  This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Federal Rule of Bankruptcy Procedure 7052.

**BACKGROUND**

The following facts are undisputed, unless otherwise indicated.

SKI is a Delaware corporation formed in 2004.  Decl. of Michael L. Schein ("Schein Decl.") Ex. A ¶ 28, ECF No. 48; Obj. ¶ 18, ECF No. 52.  SKI was in the business of selling soups made from the recipes of Al Yeganeh, a New York City restaurateur made famous by a 1995 episode in the television series "Seinfeld."  Schein Decl. ¶ 28, ECF No. 48; Obj. ¶ 18, ECF

No. 52.  Pursuant to a license agreement with Yeganeh (the "Yeganeh Rights"), SKI used Yeganeh's name, likeness, and recipes to sell soup in store fronts and in supermarkets.  Obj. ¶ 18; Tr. 82:16-20.[2]

SKI's directors included TOSI Defendants Rametta, Rubano, and Crane, and the Bello Group – Bello, Rosenbaum, and McCreery.  Schein Decl., Ex. A ¶ ¶ 24-26, 30, 33, 35, ECF No. 48.  Another TOSI Defendant, Bertrand, held the position of Chief Financial Officer as early as 2004 and served as the Debtor's president at various times.  Schein Decl., Ex. A ¶ 32, ECF No. 48.  Hart, although not an original member of the board, became a director in early 2007.  Schein Decl., Ex. A ¶ 27, Ex. G ¶ 1, ECF No. 48; Complaint ¶ ¶ 38-39, ECF No. 1.  Gracin served as secretary to SKI and through his former law firm, L&E, served as SKI's legal counsel.  Schein Decl., Ex. A ¶ 34, ECF No. 48.

In 2007, SKI obtained $1 million in secured financing from Commerce Bank, N.A. (the "CB Loan").  Mot. 6, ECF No. 47.  The CB Loan is evidenced by a Loan and Security Agreement and Revolving Term Note, each dated April 11, 2007.  Mot. 6, ECF No. 47.  Certain insiders executed limited personal guaranties of the CB Loan in varying amounts: Bello for $600,000, Rosenbaum for $300,000, McCreery for $120,000, Hart for $120,000, and Bertrand for $60,000.  Mot. 6, ECF No. 47; Schein Decl., Ex. A ¶ 52, ECF No. 48.  The CB Loan matured on April 15, 2008, but SKI failed to pay the loan when it came due.  Mot. 6, 8, ECF No. 47.  Two months later, on June 11, 2008, T.D. Bank (as successor to Commerce Bank, N.A.) assigned all its right, title, and interest in the CB Loan to Hart.  Mot. 8, ECF No. 47; Schein Decl., Ex. F, ECF No. 48; Obj. ¶ 14, ECF No. 52.

---

[2] "Tr." refers to the transcript of the evidentiary hearing held on August 29, 2013.

In the same time period when Hart acquired the rights to the CB Loan, Hart was negotiating to lend new funds to SKI.  On or about June 17, 2008, SKI borrowed $538,000 from Hart (the "Hart Direct Loan," and together with the CB Loan, the "Hart Loans") and executed a promissory note evidencing that indebtedness.  POC 42-1, Ex. A,  28-41.[3]  The note matured on June 17, 2009.  POC 42-1, Ex. A, 28.  SKI defaulted on the Hart Direct Loan.  POC 42-1 ¶ 5.

In 2009, TOSI was incorporated.  See Trustee's Decl. ("T. Decl.")  ¶ 6, ECF No. 55; Tr. 69:2-8.  In December 2009, SKI transferred all its assets of value, including the Yeganeh Rights, to TOSI.  T. Decl. ¶ 6, ECF No. 55; Tr. 63:10-17; Tr. 64:6-8.[4]  In exchange for SKI's assets, TOSI agreed to pay $100,000 to SKI and to guarantee approximately $3,500,000 in SKI's debt, including the Hart Loans.  Tr. 63:10-17.  SKI transferred its assets to TOSI, but TOSI never made the $100,000 payment to SKI.  Tr. 63:17-18.

The record does not reflect whether Hart sought to collect from SKI, the primary obligor of the Hart Loans, prior to SKI's bankruptcy, or from Bertrand, a guarantor of the CB Loan. Hart did negotiate a forbearance agreement with TOSI, as disclosed in a Form 8K filed with the Securities and Exchange Commission on August 6, 2012.  Schein Decl., Ex. H 3, ECF No. 48. In the Form 8K, TOSI stated that a May 20, 2011 forbearance agreement between Hart and TOSI provided for Hart to receive interest only payments and shares of TOSI stock, in exchange for Hart's agreement to forbear enforcing TOSI's guaranties on the defaulted Hart Loans.  Schein Decl., Ex. H, 3, ECF No. 48.  The parties extended this forbearance agreement through August 31, 2013.  Schein Decl., Ex. H, 3, ECF No. 48.

---

[3] Citations to "POC" are to proofs of claim filed in the Debtor's main bankruptcy case, Case No. 10-44670.
[4] SKI retained certain Yeganeh Rights over the Mexican market and a right to receive one percent royalty payments from TOSI for five years.  The Bello Group and the Trustee agree that these assets are worthless. Tr. 64:6-8; Bello Group Answer ¶ 142, Adv. Pro. No. 10-01330, ECF No. 1, Ex. 14.

Hart did seek to enforce the Bello Group members' respective guaranties of the CB Loan. Between August 2008 and July 2009, Hart served Bello, Rosenbaum, and McCreery with notices of default and demands for payment. Mot. 8, ECF No. 47. On or about August 14, 2009, Hart filed a motion for summary judgment in lieu of complaint in New York County Supreme Court against Bello, Rosenbaum, and McCreery to recover under their guaranties of the CB Loan (the "Guaranty Claims"). Obj. ¶ 36, ECF No. 52. After the state court denied summary judgment, on October 26, 2010 the Bello Group interposed an answer, asserting counterclaims against Hart and third-party claims against the TOSI Defendants, TOSI Affiliates, and Gracin. Schein Decl., Ex. A, ECF No. 48. The Bello Group's relevant counterclaims and third party claims fall into three categories. The first group consists of derivative claims on behalf of SKI, for breach of fiduciary duty, legal malpractice, avoidance of a fraudulent conveyance, aiding and abetting a fraudulent conveyance, and a demand for an accounting (the "Derivative Claims"). Mot. 9 n. 6, ECF No. 47; see Schein Decl., Ex. A, ECF No. 48. The second group of claims are Bello Group members' individual claims for subrogation, indemnification, and contribution (the "Contingent Claims"). Mot. 9-10 n. 7, ECF No. 47. The Contingent Claims are only triggered if the Bello Group members are found liable on the guaranties, pay their respective liabilities, and the CB Loan becomes indefeasibly paid in full. See Schein Decl., Ex. A, ECF No. 48. The third type of claim consists of a claim asserted by John Bello for breach of contract (the "Bello Contract Claim"). Mot. 10 n. 8, ECF No. 47; see Schein Decl., Ex. A, ECF No. 48.

On May 18, 2010, five creditors filed an involuntary bankruptcy petition against SKI. Involuntary Petition, Case. No. 10-44670, ECF No. 1. On November 3, 2010, the Court issued an Order for Relief and Robert L. Gelzer was appointed as Chapter 7 Trustee. Order for Relief, Case. No. 10-44670, ECF No. 20.

Several proofs of claim filed in the SKI bankruptcy case are relevant to the Settlement. Members of the Bello Group filed proofs of claim asserting each member's Contingent Claim against SKI.  POC 47-1; POC 48-1; POC 49-1.  To the extent that the claims were to become non-contingent, the Bello Group argues that they should be subrogated to Hart's rights against SKI, namely Hart's security interest in SKI's assets.  POC 47-1 ¶ 17; POC 48-1 ¶ 36; POC 49-1 ¶ 28.  As a result, the amount of each proof of secured claim reflects each defendant's maximum liability under the guaranties: Bello claims $600,000, McCreery claims $100,000,[5] and Rosenbaum claims $300,000.  POC 47-1 ¶ 17; POC 48-1 ¶ 36; POC 49-1 ¶ 28.

Hart filed a proof of secured claim in the amount of $2,005,157.50, reflecting predominantly her claims based on the CB Loan and the Hart Direct Loan.  POC 42-1.[6]  L&E filed a proof of claim in the amount of $344,139.22 for unpaid legal fees incurred since 2008.  POC 43-1.  L&E asserted that its claim is secured and attached a security agreement signed by SKI on January 1, 2009.  POC 43-1.  Park 100 Foods, Inc. ("Park 100"), a food processor and supplier to SKI, filed a proof of claim in the amount of $1,200,000.  POC 50-1.  Park 100 attached to its proof of claim a promissory note issued by SKI for $1,200,000 and documents purporting to create a security interest, all dated October 1, 2008.  POC 50-1; Tr. 33:6-12; Tr. 34:14-15.

On April 28, 2011, the Trustee filed an adversary proceeding against Hart, Gracin, L&E, and the TOSI Defendants (the "Trustee Action").  Complaint, ECF No. 1.  The Trustee essentially asserts the same Derivative Claims that the Bello Group asserted as third-party claims

---

[5] It is unclear why McCreery's proof of claim alleges a maximum liability of $100,000.  A copy of McCreery's limited guarantee and other filings indicate that McCreery guaranteed $120,000 of the CB Loan. Schein Decl., Ex. E, ECF No. 48; Mot. 6, ECF No. 47.

[6] Hart also filed a duplicative claim, claim 51, which was later withdrawn.

in response to Hart's state court action.  Complaint ¶ ¶ 128-43, 149-56, 181-88, ECF No. 1.  The Trustee Action also seeks to equitably subordinate the claims of Hart and L&E to all allowed unsecured claims.  Complaint ¶ ¶ 157-174, ECF No. 1.  The Court assigned the Trustee Action to mediation on December 19, 2011.  Mediation Order, ECF No. 24.

On June 15, 2011 Hart's state court action, which had been removed on November 24, 2010 by the Bello Group to the United States District Court for the Eastern District of New York, was referred to this Court (the "Hart/Bello Action").  Referral Order, Case No. 11-cv-02165-ENV-RML, ECF No. 49 (E.D.N.Y. June 15, 2011); Summons and Notice, Adv. Pro. No. 10-01330, ECF No. 12.  On October 7, 2011, the Court entered an order staying the Hart/Bello Action pending the outcome of the Trustee Action. Order Staying Action, Adv. Pro. No. 10-01330, ECF No. 16.  The Court modified the stay on September 28, 2012 to allow the Trustee and parties in the Hart/Bello Action to seek relief related to the Court's approval of a settlement of the Trustee Action.  Order Modifying Stay, Adv. Pro. No. 11-01330, ECF No. 17.

On June 28, 2013, the Trustee, Hart, Gracin, L&E, and the TOSI Defendants filed the Motion seeking Court approval of the Settlement, which was signed by all parties to the Trustee Action ("Settling Parties").  Mot. 1-2, ECF No. 47.

In the Settlement, Hart, Gracin, L&E, and the TOSI Defendants provide several forms of consideration to the estate.  First, the TOSI Defendants agree to pay $950,000 to the Debtor's estate.  Settlement ¶ 1, ECF No. 47, Ex. A.  TOSI's counsel represents that a director and officer liability insurance policy ("D&O Policy") will contribute $600,000 of that amount and the TOSI

Defendants will pay the remaining $350,000.[7] Tr. 105:9-18. TOSI Defendants Bertrand and Rametta also agree to withdraw with prejudice any secured claims against the Debtor's estate. Settlement ¶ 2, ECF No. 47, Ex. A. Second, L&E and Gracin agree to pay to the Debtor's estate $375,000, which is funded, at least partially, by a professional malpractice insurance policy. Settlement ¶ 1, ECF No. 47, Ex. A; Tr. 106:2-19. L&E also agrees to withdraw with prejudice its secured claim of $344,139. Settlement ¶ 2, ECF No. 47, Ex. A. Hart agrees to subordinate her claim of $2,200,000, so as to receive distribution only after all allowed, unsecured claims have been paid in full. Settlement ¶ 2, ECF No. 47, Ex. A. In addition, Hart and the TOSI Defendants agree to provide the Trustee with a document executed by Park 100 withdrawing its $1,200,000 proof of claim with prejudice. Settlement ¶ 2, ECF No. 47, Ex. A.

In turn, the Trustee agrees to withdraw, with prejudice, its claims against Hart, Gracin, L&E, and the TOSI Defendants in the Trustee Action. Settlement ¶ 3, ECF No. 47, Ex. A. Hart agrees to withdraw, without prejudice, claims asserted in the Hart/Bello Action against the Bello Group for their guaranties of the CB Loan. Settlement ¶ 1, ECF No. 47, Ex. A. The Settling Parties also ask the Court to dismiss, without prejudice, the Bello Group's counterclaims and third party claims in the Hart/Bello Action, except for the Bello Group's Derivative Claims, which would be dismissed with prejudice. Settlement ¶ 1, ECF No. 47, Ex. A.

The Court conducted an evidentiary hearing on August 29, 2013, at which the Trustee testified in support of the Motion. Counsel for the Bello Group cross-examined the Trustee at the hearing.

---

[7] At the August 29, 2013 evidentiary hearing, TOSI's counsel stated that the same $5 million D&O Policy covers SKI, TOSI, and the TOSI Defendants. Tr. 105:2-18. The D&O Policy is a "dwindling asset" because the policy pays the legal fees for the insured parties, and thus continued litigation reduces the maximum settlement or judgment that can be collected from the D&O Policy. Tr. 105:2-8; Tr. 105:19-24.

The Bello Group objects to the Motion.  First, the Bello Group alleges that the Trustee fails to provide information so that parties in interest can evaluate the Trustee's causes of action and the amount of any potential recovery, Obj. ¶¶ 54-60, ECF No. 52, and that the Trustee Action is likely to recover a substantial amount for the estate, Obj. ¶¶ 69-75, ECF No. 52. Second, the Bello Group contends that the Settlement it is not reasonable based upon a number of factors.  Obj. ¶¶ 61-68, ECF No. 52.  The Bello Group asks the Court to review the reasonableness of the Settlement under heightened scrutiny because, they contend, the Settlement is an "insider deal."  Obj. ¶ 54, ECF No. 52.  Third, the Bello Group argues that the Settlement is unfair to the Bello Group.  Obj. ¶¶ 87-91, ECF No. 52.  Fourth, the Bello Group argues that the Settlement violates Due Process, Obj. ¶¶ 76-86, ECF No. 52, and the doctrine of "unclean hands," Obj. ¶¶ 92-93, ECF No. 52.

## **LEGAL STANDARD**

Federal Rule of Bankruptcy Procedure 9019 provides, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).[8]  A bankruptcy court may approve a compromise and settlement pursuant to Rule 9019 when the settlement is "fair, equitable, and in the best interests of the estate."  In re Residential Capital, LLC, 497 B.R. 720, 749 (Bankr. S.D.N.Y. 2013).  "As a general matter, settlements or compromises are favored in bankruptcy and, in fact, encouraged."  In re Adelphia Commc'ns Corp., 368 B.R. 140, 226 (Bankr. S.D.N.Y. 2007).  "[I]n an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial

---

[8] Unless otherwise indicated, "Rule" refers to the Federal Rules of Bankruptcy Procedure and "Section" refers to a section under the Bankruptcy Code, Title 11 of the United States Code.

and reasonable doubts." <u>Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.</u> <u>Anderson</u>, 390 U.S. 414, 424 (1968).

The bankruptcy court has "sound discretion" to approve or reject a settlement under Rule 9019. <u>Adelphia Commc'ns</u>, 368 B.R. at 226. In evaluating a settlement, "[t]he court may give weight to the trustee's opinion that the settlement is fair and equitable," but may not simply adopt the Trustee's position without making its own independent inquiry. <u>In re Copperfield</u> <u>Invs., LLC</u>, 401 B.R. 87, 92 (Bankr. E.D.N.Y. 2009) (<u>citing</u> <u>Adelphia Commc'ns</u>, 368 B.R. at 159); <u>see</u> <u>O'Connell v. Packles (In re Hilsen)</u>, 404 B.R. 58, 70 (Bankr. E.D.N.Y. 2009).

"It is not the court's task to determine whether the settlement proposed by the parties is the best possible, or fairest, or most appropriate resolution of the dispute." <u>Hilsen</u>, 404 B.R. at 70. "A bankruptcy court need not conduct an independent investigation into the reasonableness of the settlement. . . . It is not necessary for the court to conduct a 'mini-trial' of the facts or the merits underlying the dispute." <u>In re Chemtura Corp.</u>, 439 B.R. 561, 594 (Bankr. S.D.N.Y. 2010) (citations omitted). The court's responsibility is to "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" <u>Cosoff v. Rodman</u> <u>(In re W.T. Grant Co.)</u>, 699 F.2d 599, 608 (2d Cir. 1983) (alteration in original) (<u>quoting</u> <u>Newman v. Stein</u>, 464 F.2d 689, 693 (2d Cir. 1972)).

In evaluating whether a settlement is above the lowest point in the range of reasonableness, bankruptcy courts in the Second Circuit look to the factors set forth in <u>Motorola,</u> <u>Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)</u> ("<u>Iridium</u>"), 478 F.3d 452 (2d Cir. 2007):

> (1) the balance between the litigation's possibility of success and the settlement's future benefits;
> (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment;

(3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement;"

(4) whether other parties in interest support the settlement;

(5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement;

(6) "the nature and breadth of releases to be obtained by officers and directors;" and

(7) "the extent to which the settlement is the product of arm's length bargaining."

Id. at 462 (alteration in original).

The settlement proponent bears the burden "to persuade the court that the settlement is in the best interests of the estate." In re MF Global Inc., 466 B.R. 244, 248 (Bankr. S.D.N.Y. 2012).

## DISCUSSION

The first Iridium factor, comparing the balance between the Settlement's benefits and the Trustee Action's possibility of success, weighs in favor of approving the Settlement.

The Trustee argues that the Settlement provides $6.5 million in value to the estate. Tr. 9:15-19. The components of the Settlement and the value ascribed by the Trustee to each are as follows:

1. Payment - $1,325,000

Under the Settlement, the estate will receive $950,000 from the TOSI Defendants, of which $600,000 will be funded by the D&O Policy, and $375,000 from L&E and Gracin.

2. Withdrawal of Secured Claims - $1,544,139

Under the Settlement, L&E will withdraw its secured claim of $344,139, and Park 100's secured claim of $1,200,000 will be withdrawn. In addition, the TOSI Defendants will waive any claim against the estate.

3.    <u>Subordination of Secured Claims</u> - $2,200,000

Under the Settlement, Hart will subordinate her secured claim of $2,200,000 to unsecured creditors.

4.    <u>Savings of Future Professional Fees</u>

The Trustee asserts that the Settlement will result in savings of future "seven-figure" legal fees and that these savings should be considered part of the value of the Settlement to the estate.  T. Decl. ¶ 3, ECF No. 55.

Thus, to arrive at a value of $6,500,000 for the Settlement, the Trustee adds to the cash payment the amounts of withdrawn and subordinated claims, and adds an estimated amount of future legal fees in the approximate amount of $1,450,000, as follows:

| | |
|---|---|
| Cash: | $1,325,000 |
| Withdrawn secured claims: | $1,544,139 |
| Subordinated secured claim of Hart: | $2,200,000 |
| Future legal costs: | <u>$1,430,861</u> |
| | $6,500,000 |

In evaluating the Settlement, each of these components will be examined separately.  The value of the cash payments, the first element, is clear.  It is appropriate to include in the value of the Settlement the withdrawal or subordination of the Hart, Park 100, and L&E claims, though these concessions do not result in a cash payment to the estate.  If these claims were allowed, it would be necessary for the estate's recovery in the Trustee Action to exceed the aggregate amount of those claims in order for other creditors to receive any payment.  The Settlement thus allows other creditors to benefit from the first dollar received by the Trustee – not the first dollar over the amount of the secured claims.  Finally, the Trustee's estimate that pursuit of this litigation to judgment would result in legal fees in excess of $1 million is reasonable, given the

number of parties involved, the fact intensive nature of the claims and defenses, the significant role that expert testimony would play in the case, and the early stage of the case.

Thus, according to the Trustee, the Settlement should be considered equivalent in value to a judgment obtained at the conclusion of litigation for approximately $6.5 million, which is seventy-six percent of the $8.5 million value of the assets transferred by SKI to TOSI, based upon a valuation of those assets by the Trustee's expert. T. Decl. ¶ 11, ECF No. 55.

Through cross-examination of the Trustee, counsel for the Bello Group questioned the value of the claim concessions provided by Hart and Park 100. With respect to Hart's claims, the Trustee was shown an SEC filing made by TOSI and was asked if he had investigated the possibility that the Hart Loans had been repaid in part by a sale of TOSI stock, Tr. 27:11-13, and if he had determined whether Hart had acquired the CB Loan at a discount, Tr. 32: 17-20, or whether Hart had negotiated different credit terms with SKI, Tr. 30:19-21. With respect to the Park 100 claim, counsel on cross-examination asked why that secured creditor agreed to withdraw its claim, and pointed out that it was filed after the bar date in this case. Tr. 33:6; Tr. 35:1.

In response to the questions raised concerning the Hart claim, the Trustee's counsel pointed out that whether Hart's claim is subject to equitable subordination, and whether it was partially paid, are matters that would be the subject of further investigation and litigation, if the Settlement were not approved, with the resulting cost and delay to the estate, Tr. 99-101, and that the subordination of the Hart claim should for these reasons be considered a benefit of the Settlement. Tr. 101:15-19.

The record shows that Hart acquired the rights to the CB Loan from T.D. Bank, Commerce Bank's successor. See Assignment of Revolving Term Note, Adv. Pro. No. 10-01330, ECF No. 1, Ex. 4 at 53; Tr. 31:21-23. Hart then loaned additional funds to the Debtor,

which accounts for the remainder of her secured claim.  POC 42-1.  In order for the Trustee to equitably subordinate Hart's secured claim, he would be required to show that Hart engaged in inequitable conduct, either in connection with the loan or subsequently, which damaged SKI.  In re Interstate Cigar Co., 182 B.R. 675, 700 (Bankr. E.D.N.Y. 1995) ("The three-part test for equitable subordination includes: 1) inequitable conduct by the claimant; 2) such misconduct giving rise to an unfair advantage for claimant or bringing harm to the creditors of the debtor and 3) equitable subordination must be consistent with the Bankruptcy Code."), aff'd sub nom. Interstate Cigar Co. v. Bambu Sales, Inc., 166 F.3d 1200 (2d Cir. 1998); In re Verestar, Inc., 343 B.R. 444, 461 (Bankr. S.D.N.Y. 2006) (noting that inequitable conduct includes "fraud, lack of good faith by a fiduciary, unjust enrichment, or enrichment brought about by unconscionable, unjust or unfair conduct or double-dealing."); see, e.g., In re Kalisch, 413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008) ("Equitable subordination is an extraordinary remedy that is to be used sparingly."), aff'd, No. 09-cv-1636-PKC, 2009 WL 2900247 (S.D.N.Y. Sept. 9, 2009); In re Radnor Holdings Corp., 353 B.R. 820, 840 (Bankr. D. Del. 2006) ("[E]quitable subordination is drastic and unusual remedy.") (quotations omitted); see also In re Le Cafe Creme, Ltd., 244 B.R. 221, 235 (Bankr. S.D.N.Y. 2000) ("[T]he mere fact of an insider relationship is insufficient to warrant subordination.").  Hart's potential defenses to the Trustee's equitable subordination claim must also be considered.  As the Trustee's counsel noted, Hart contends that she was no longer an officer or director of SKI at the time of the transfer of assets to TOSI, Hart Answer ¶ 10, ECF No. 6, a contention which, according to the Trustee's counsel, was substantiated by documentation presented to him during settlement negotiations.  Tr. 100:2-10.

In any event, whether or not the Hart claim could be attacked by the Trustee on various theories, its subordination pursuant to the Settlement resolves all uncertainty and saves substantial legal fees.  Even if a discount is applied to the value of Hart's agreement to

subordinate her claim, to reflect the possibility that it may have been paid in part through the sale of TOSI stock, it is still appropriate to assign a value of at least approximately $1,750,000 to that agreement (i.e., $2,200,000 less the $425,000 value of stock which, according to TOSI's November 30, 2012 Form 10-Q, was transferred to her).  See Bowie Aff. Ex. 3 at 13, Adv. Pro. No. 11-01317, ECF No. 53.

With respect to the withdrawal of the Park 100 claim, there is no basis to discount the value of this concession in the context of the Settlement.  No reason has been given to doubt the claim's validity.  The fact that Park 100's claim was filed after the bar date is irrelevant; failure of a secured creditor to file a claim by the bar date does not result in a forfeiture of its security interest.  "A well-established principle of bankruptcy law is that liens pass through bankruptcy proceedings unaffected.  This means that a secured creditor need not file a claim in a bankruptcy proceeding to preserve its lien. Rather, the secured creditor may ignore the bankruptcy proceeding and look to the lien for satisfaction of its debt." In re CIS Corp., No. 97-cv-622-LMM, 1997 WL 666265, at *3 (S.D.N.Y. Oct. 24, 1997) (citations omitted); accord, Harmon v. U.S. Through Farmer's Home Admin., 101 F.3d 574, 581-82 (8th Cir. 1996); In re Tarnow, 749 F.2d 464, 465 (7th Cir. 1984).

In applying the first Iridium factor, it is necessary, next, to compare the benefits afforded to the estate by the Settlement with the recovery that would be available through continued pursuit of the Trustee Action, taking into consideration the possibility of success in that action. The Trustee argues that, although he considers the Trustee Action to be meritorious, numerous factual and legal defenses have been asserted by the defendants.  All defendants contend that the acts giving rise to the Trustee's claims – the transfer of SKI's assets to TOSI – were in the best interests of SKI's shareholders and creditors given SKI's dire financial condition at the time of the transfer.  Mot. 15, ECF No. 47.  Gracin and L&E raise legal and factual defenses to the

- 15 -

Trustee's malpractice claims as well, contending that all legal services they provided were performed for the benefit of SKI, and denying that they represented both SKI and TOSI in connection with the disputed asset transfer.  Mot. 15, ECF No. 47.  It is also significant that the D&O Policy, which funds $600,000 of the Settlement, also covers the defendant officers' and directors' legal fees, and is thus a "wasting asset" that would diminish as litigation continued. Tr. 105:4-6.

Most importantly, however, the value of the assets transferred by SKI to TOSI – the Yeganeh Rights and related assets – is sharply disputed.  T. Decl. ¶¶ 11-12, ECF No. 55.  While the Trustee's valuation expert ascribed a value of $8.5 million to SKI's assets during the two months prior to the transfer to TOSI, defendants, during the settlement process, provided two separate valuations ascribing a negative value to those assets.  T. Decl. ¶ 11, ECF No. 55. Resolving this dispute through litigation would involve expert discovery and testimony, with attendant substantial cost in the form of legal and expert witness fees.

Moreover, valuation of assets – particularly intangible assets such as the Yeganeh Rights – is a complicated issue that is subject to interpretation.  See In re TC Liquidations LLC, 463 B.R. 257, 271 (Bankr. E.D.N.Y. 2011) (rejecting defendant's valuation of patents, trademarks, and other intangibles as unreliable because it was based upon unsupported, speculative sales projections); Henry v. Champlain Enterprises, Inc., 445 F.3d 610, 619 (2d Cir. 2006) ("There is no universally infallible index of fair market value. There may be a range of prices with reasonable claims to being fair market value.") (quotations omitted); In re R.M.L., Inc., 92 F.3d 139, 148 (3d Cir. 1996)  (stating that the difficulty of determining what constitutes reasonably equivalent value is exacerbated in cases where intangible assets are involved).  As the Trustee noted,

> While my retained expert Goldin, as well as I as Trustee and my professionals, believed that there were very serious flaws in the valuation proffered by the TOSI Defendants' expert, the Settling Defendants believed that Goldin's valuation was defective for the reason, among others, that it was based upon what they alleged to be unsupportable speculation of what the Debtor might have been able to realize from its business operations and product if it had been under management different than that of those who were running the Debtor's business as of late 2009.

T. Decl. ¶ 18, ECF No. 55.  Given the nature of the assets and the range of values claimed by the parties' experts, it is certainly possible that the outcome of a costly trial on the merits would be the conclusion that TOSI's guarantee of $3.5 million of SKI debt constituted reasonably equivalent value for the assets transferred.

Furthermore, even if the Trustee were to prevail in his fraudulent conveyance claims, and obtain either a money judgment, or a judgment directing the return to the SKI estate of the assets transferred to TOSI, uncertainties about the ultimate recovery to the estate abound.  The Trustee's ability to collect a substantial money judgment from TOSI is questionable.  The Trustee confirmed that he and his counsel had been informed in the course of settlement talks that TOSI was not profitable, and this is consistent with the Form 10-K and 10-Q for TOSI, submitted in connection with the Bello Group's opposition to the Trustee's Motion.  Tr. 16:17-22; Tr. 18:16-19; see Bowie Aff. Ex. 2 at 21 & Ex. 3 at 2, ECF No. 53.  The path for recovery for the estate through realization on the assets transferred by SKI to TOSI is also fraught with uncertainty.  As the Trustee testified, if the transferred assets were recovered, it would in all likelihood be necessary for the Trustee to operate SKI, at least in the short run, and obtain a new appraisal.  The Trustee would be required to go through the process of marketing the assets, advertising them, and conducting an auction.  All of these activities would generate costs which would reduce the ultimate recovery to creditors.  Tr. 80-87.  Any such recovery would also be

subject to the secured claims that, under the Settlement, are being subordinated or withdrawn.

Tr. 45:4-15.

Given the fact that the assets transferred by SKI to TOSI have not generated profit for TOSI, any conclusion that the assets are valuable is based upon an assumption that these assets have substantial unrealized value. The Bello Group argues that this assumption is supported by TOSI's market capitalization of approximately $15.75 million as of April 1, 2013. Obj. ¶ 72, ECF No. 52. The Bello Defendants would like the Trustee to entertain this assumption, as counsel to the Bello Group stated in argument:

> But at some point the pot of gold is so big that you cannot say, you know what, I'm just going to talk insurance and walk away. And that's what happened here. And the problem is that we think that pot of gold is -- is a very, very big one. Wal-Mart, Campbell's, Subway, these are the kind of companies who want to get into the -- want to get a part of this brand, and the problem is the people who run it don't make money. If you get Campbell's in there, if you get Subway in there, if you -- you know, once they're in Wal-Mart, who knows. You had 8,500 franchise applications. All of this is of record. All of this says to me, this pot of gold may well be huge.

Tr. 117:9-19. This argument – that the possibility that pursuit of the Trustee's fraudulent conveyance claims against TOSI would result in the recovery of a "pot of gold" has been insufficiently explored and should be given greater weight on this Motion – ignores both the potential defenses to that claim and potential obstacles to recovery of the assets, in the event that the litigation were successful.

First of all, the assertion by counsel to the Bello Group that the Trustee's fraudulent conveyance claim is a "slam dunk," Tr. 113:1-2, cannot be accepted. As discussed above, the value of the assets transferred from SKI to TOSI is a critical issue with respect to that claim and is hotly disputed. It cannot be assumed, for the purpose of analysis under Rule 9019, that the Trustee's expert would prevail in a valuation battle.

The Bello Group argues that the Settlement cannot be approved without examination of the expert reports that the parties obtained during the settlement process. Tr. 122:16-20; Tr. 125:13-18. The Bello Group would have the Court consider evidence concerning valuation of the assets of SKI, in 2009 and at the present. Tr. 122:13-20; Tr. 124:10-16. It is necessary to canvass the relevant issues to determine whether the Settlement is in the best interests of the estate, W.T. Grant Co., 699 F.2d at 608, and the value of the assets conveyed by SKI is one of such issues. The Trustee retained a reputable valuation expert and utilized that valuation as a baseline in negotiating the Settlement. While trial of the Trustee Action would undoubtedly involve analysis of the parties' competing valuations, which, to be meaningful, would require expert testimony, it is neither necessary nor appropriate to engage in this type of litigation in the context of a Rule 9019 motion. See Chemtura, 439 B.R. at 594 ("It is not necessary for the court to conduct a 'mini-trial' of the facts or the merits underlying the dispute.").

Moreover, the Bello Group's argument that the value of the Yeganeh Rights should be more fully explored and given greater weight in the context of this Motion ignores the significant potential obstacles that the Trustee would face to recovery of those assets even if the litigation were successful. For example, if the Trustee were to prevail on claims seeking recovery of the transferred assets, any creditors of TOSI who have security interests in the assets may be permitted to retain those liens, up to the extent of any value given in good faith for such interests. See 11 U.S.C. § 548(c) (enabling good faith transferees in a Section 548 fraudulent conveyance action to retain a lien on the recovered assets, to the extent of the value given); see also In re Classic Coach Interiors, Inc., 290 B.R. 631, 640 (Bankr. C.D. Ill. 2002) (recognizing a "short line of authority" holding that secured creditors of a transferee may retain their security interest in property recovered by a trustee's avoidance action). Moreover, TOSI could seek bankruptcy protection. A bankruptcy filing by TOSI would relegate the Trustee to the status of an unsecured

- 19 -

creditor, certainly with respect to any money judgment obtained against TOSI, and possibly also with respect to a claim for recovery of the assets conveyed by SKI to TOSI. Under § 544(a)(1), TOSI's bankruptcy trustee would step into the shoes of a judicial lien creditor of TOSI, possibly cutting off any right of the SKI estate to recover specific assets conveyed by SKI to TOSI in 2009. At a minimum, a bankruptcy filing by TOSI would require the Trustee to engage in additional litigation in the context of TOSI's bankruptcy case to assert the SKI estate's claim to the assets, whether under a theory of constructive trust or otherwise.

Finally, the desire of shareholders or guarantors such as the Bello Group to pursue litigation, from which they have little to lose, in preference to the benefits offered by the Settlement, cannot be given substantial weight. In evaluating a proposed settlement under Rule 9019, the Court must be careful not to "expose the Debtor[] to the demands of creditors preferring to risk estate assets in a litigation lottery." In re Capmark Fin. Grp. Inc., 438 B.R. 471, 519 (Bankr. D. Del. 2010); see In re Ambac Fin. Grp., Inc., 457 B.R. 299, 305 (Bankr. S.D.N.Y. 2011) ("Nothing in Iridium or other applicable case law requires a debtor to gamble with the estate's interest at the behest of an out-of-the-money party who has nothing to lose by a roll of the litigation dice."), aff'd, No. 10-B-15973-SCC, 2011 WL 6844533 (S.D.N.Y. Dec. 29, 2011), aff'd, 487 F. App'x 663 (2d Cir. 2012).

For all of these reasons, it is within the Trustee's business judgment and within the range of reasonableness to accept the Settlement, valued in excess of $6.0 million, which the Trustee believes will provide a forty-three percent distribution to unsecured creditors, Tr. 40:14-24, instead of pursuing complex litigation, which would likely take years to resolve. The Trustee's duty is to marshal assets for the benefit of creditors, as is accomplished through the Settlement, not to risk estate assets to pursue a larger recovery for shareholders. Accordingly, the first Iridium factor weighs in favor of approving the Settlement.

As to the second <u>Iridium</u> factor, this adversary proceeding presents a strong likelihood of complex, protracted, and expensive litigation.  As discussed above, the valuation of SKI's assets at the time of the alleged fraudulent transfer would be a key issue in proving liability under a fraudulent transfer theory and in proving damages under other causes of action.  This litigation would focus on the value of the SKI assets and TOSI's consideration as of December 2009, and would require the estate to bear significant expenses in a battle of experts.  T. Decl. ¶ 18, ECF No. 55.  To prove liability under any theory, the Trustee would have to engage in extensive document discovery and depositions for each of the many parties to this action.  T. Decl. ¶ 19-20, ECF No. 55.  The Settlement also foregoes the need to engage in a claims objection process with Hart, Park 100, and L&E, who have withdrawn or subordinated their secured claims as part of the Settlement.  The Court credits the Trustee's statement that "by early November 2011, the potential Chapter 7 administrative fees . . . already were in the hundreds of thousands of dollars," T. Decl. ¶ 9, ECF No. 55, and further complex litigation would create "additional seven-figure legal fees and other administrative costs."  T. Decl. ¶ 3, ECF No. 55.  The Settlement provides a certain recovery and avoids costly, complex litigation.

The third <u>Iridium</u> factor, consideration of creditors' best interests, also weighs in favor of approving the Settlement.  Under the Settlement, unsecured creditors jump ahead of over $3.0 million in secured claims, which are being either withdrawn or subordinated by Hart, Park 100, L&E, and the TOSI Defendants.  As a result, unsecured creditors should receive some distribution from the $1,325,000 gross settlement payment by the TOSI Defendants, Gracin, and L&E.  Although professionals' applications for compensation have not yet been filed yet in this case, the Trustee expects that after administrative expenses are paid, unsecured creditors will receive a pro rata distribution of about forty-three percent.  Tr. 40:14-24.  Three creditors, all Settling Parties, affirmatively support the Settlement and at least fifty other creditors, who in the

aggregate hold claims in excess of $1.7 million, have not objected to the Settlement.  Thus, at least 77% of creditors in value and 95% of creditors in number have not objected to the Settlement.

The Bello Group argues that the Settlement should be disapproved because, whether or not it is in the creditors' best interests, it is unfair to the Bello Group.  "[A] debtor may seek approval of a settlement over major creditor objections as long as it carries its burden, . . . including [that] the paramount interests of creditors[] weighs in favor of settlement."  Capmark Fin. Grp., 438 B.R. at 519; see In re Hibbard Brown & Co., 217 B.R. 41, 47 (Bankr. S.D.N.Y. 1998) (noting fact that certain non-participants in a proposed settlement would not receive releases "is an unavoidable consequence of the settlement process," and "does not render the [proposed settlement] unfair, unreasonable or inadequate"); see also Hilsen, 404 B.R. at 76; In re Key3Media Grp., Inc., 336 B.R. 87, 97-98 (Bankr. D. Del. 2005) (stating that even when the "largest independent claimholders" object to a settlement, the objection "cannot be permitted to predominate over the best interests of the estate as a whole"), aff'd, No. 03-10323-MFW, 2006 WL 2842462 (D. Del. Oct. 2, 2006).  It may be in the Bello Group's interest to object to the Settlement in their position as litigants in the Hart/Bello Action.  However, the overriding consideration is the Settlement's benefits to the creditor body, and not whether the Settlement benefits defendants in a dispute among the Debtor's former insiders.

Furthermore, the Settlement does not treat the Bello Group unfairly.  The right to assert the Derivative Claims passed to the Trustee when SKI filed its bankruptcy petition.  In re Ambac Fin. Grp., Inc., 487 F. App'x 663, 665 (2d Cir. 2012) ("While normally the fiduciary obligation of officers, directors and shareholders is enforceable directly through a stockholder's derivative action, it is, in the event of bankruptcy of the corporation, enforceable by the trustee. . . .") (internal quotation omitted).  Thus, the Bello Group has no interest in the Derivative Claims.

- 22 -

The Bello Group's remaining claims consist of the Contingent Claims, which are contingent upon the Bello Group members being found liable on the CB Loan guaranties of payment, and the Bello Contract Claim. Should Hart seek to enforce the guaranties, the dismissal of the Bello Group's counterclaims and third party claims in the Hart/Bello Action, without prejudice, will not prevent the Bello Group from asserting the same counterclaims or third party claims again.

In evaluating the fourth Iridium factor, the Court gives little weight to the Joinder filed by certain of the Debtor's equity holders. It is unclear what proportion of the Debtor's equity is held by the shareholders who filed the Joinder.[9] Accordingly, the Court cannot determine if the Joinder represents extensive shareholder opposition. Moreover, when making decisions for an insolvent estate such as that of SKI, the Trustee owes its duty to creditors and not to shareholders. See In re Spielfogel, 211 B.R. 133, 145 (Bankr. E.D.N.Y. 1997) (recognizing, in dicta, that "the evaluation of a settlement offer in an insolvent Chapter 7 estate is straightforward and the creditors take precedence").

The remaining Iridium factors weigh in favor of approving the Settlement. All parties are represented by competent and experienced counsel, and the Court has reviewed the Settlement and briefings in detail and held eight hearings, including an evidentiary hearing on August 29, 2013. The Trustee employed Special Litigation Counsel and a knowledgeable financial expert in Goldin Associates. The TOSI Defendants, Hart, Gracin, and L&E were represented by competent counsel. While it is true that certain SKI officers and directors, the individual TOSI Defendants, are being released from liability under the Settlement, those releases are in

---

[9] The Joinder describes the shareholders as "investors of the cumulative sum of approximately $4 million in SKI." Joinder 2, ECF No. 54. The Joinder does not state when or how the $4 million valuation was made, or the total capitalization of the Debtor at that point in time. As a result, the Court cannot determine the significance of the ownership interest represented by the Joinder.

consideration of a $950,000 payment to the estate.  Of this settlement payment, $350,000 will be

funded by TOSI Defendants individually.  Given the amount and source of the TOSI

Defendants' settlement payments, the releases are reasonable in the context of this Settlement.

See In re Ambac Fin. Grp., Inc., No. 11-cv-7529-NRB, 2011 WL 6844533, at *6 (S.D.N.Y. Dec.

29, 2011) (finding that officer and director releases from derivative claims were reasonable

because the court considered the releases in the context of all Iridium factors, after an evidentiary

hearing), aff'd, 487 F. App'x 663 (2d Cir. 2012).  The Trustee arrived at the Settlement after

more than a year and a half of discussions and mediation sessions with the Settling Parties

individually, the Settling Parties as a group, with various insurance carriers, and with various

legal counsel to those parties.  T. Decl. ¶ ¶ 13-15, ECF No. 55; Tr. 59:18 - 60:7.  The Trustee is a

disinterested party and the Settlement is the result of arm's length bargaining.  T. Decl. ¶ 2, ECF

No. 55.

Upon applying the Iridium factors to this Settlement, the Court finds that the evidence

weighs in favor of approving the Settlement.  The Trustee has met his burden to show that the

Settlement is above the "lowest point in the range of reasonableness."  In re W.T. Grant Co., 699

F.2d at 608.  The Settlement does not require heightened scrutiny as an "insider settlement,"

since the Trustee, and not the Debtor's management or principals, negotiated the Settlement on

behalf of SKI.  See In re Drexel Burnham Lambert Grp., Inc., 134 B.R. 493, 498 (Bankr.

S.D.N.Y. 1991) (applying higher scrutiny to approval of a settlement between insider and the

chapter 11 debtor, where no trustee was appointed); In re Present Co., 141 B.R. 18, 23 (Bankr.

W.D.N.Y. 1992) (disapproving settlement where there was "no investigation by a disinterested

trustee or examiner"); In re Alma Energy, LLC, No. 10-cv-80-ART, 2010 WL 4736905, at *4-5

(E.D. Ky. Nov. 16, 2010) (applying higher scrutiny to settlement between debtor and insider

where settlement was entered before trustee was appointed).  For these reasons, the Court finds

that the Settlement falls well above "the lowest point in the range of reasonableness," and should be approved.  In re W.T. Grant Co., 699 F.2d at 608.

    In finding that the Settlement is in the estate's best interests, the Court also rejects the Bello Group's argument that the "unclean hands" doctrine should prevent the Court's approval of the Settlement.  Obj. ¶¶ 92-93, ECF No. 52; see PenneCom B.V. v. Merrill Lynch & Co., 372 F.3d 488, 493 (2d Cir. 2004) (applying unclean hands doctrine only when a party "has committed some unconscionable act that is directly related to the subject matter in litigation. . . .") (quotations omitted).  The Bello Group's objection that the Settlement violates Due Process is equally meritless because, as discussed above, the Trustee has provided adequate information regarding the benefits of the Settlement and all parties had an opportunity to object to the Settlement and to cross-examine the Trustee.  Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314-15 (1950) (To satisfy Due Process, "notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance.") (citations omitted).

    The Motion also seeks to dismiss the Hart/Bello Action.  An adversary proceeding may be dismissed without a party's consent pursuant to Rule 7041(a)(2).  There is a presumption in favor of granting a plaintiff's non-consensual request for dismissal, unless it will unfairly prejudice defendants, as shown by such factors as: "(1) the plaintiff's diligence in bringing the motion; (2) any 'undue vexatiousness' on plaintiff's part; (3) the extent to which the suit has progressed, including the defendant's effort and expense in preparing for trial; (4) the duplicative expense of relitigation; and (5) the adequacy of plaintiff's explanation for the need to dismiss."  Gap, Inc. v. Stone Int'l Trading, Inc., 169 F.R.D. 584, 588 (S.D.N.Y. 1997) (quoting Zagano v. Fordham Univ., 900 F.2d 12, 14 (2d Cir. 1990)), aff'd, 125 F.3d 845 (2d Cir. 1997).  Hart agrees to dismiss her causes of action against the Bello Group, without prejudice, but the Bello Group

does not consent to dismissing its remaining counterclaims and third party claims in the Hart/Bello Action. Rule 7041 provides that if a defendant has pleaded a counterclaim, "the action may be dismissed over the defendant's objection only if the counterclaim can remain pending for independent adjudication." Rule 7041(a)(2). The focus of the inquiry under Rule 7041(a)(2) is upon whether the Bello Group's counterclaims may be adjudicated by the Court after dismissal of Hart's claims, not whether the Court would ultimately exercise its jurisdiction to hear those claims. See Lang v. Mfrs. & Traders Trust Co., 274 F.R.D. 175, 184-85 (D.M.D. 2011); 28 U.S.C. 1367. Given that the Objection does not address Rule 7041 or the Zagano factors, or otherwise rebut the presumption in favor of dismissal, this Court concludes that dismissal of the Hart/Bello Action is warranted.

Accordingly, all claims, counterclaims, and third-party claims in the Hart/Bello Action are dismissed without prejudice, except for the Derivative Claims, which are dismissed with prejudice.

## CONCLUSION

For the reasons set forth above, the Motion is granted and the Settlement is approved. A separate order will issue.



**Dated: Brooklyn, New York
February 28, 2014**

**Carla E. Craig
United States Bankruptcy Judge**